2014-1232

# United States Court of Appeals
# for the Federal Circuit

VIRTUALAGILITY INC.,

*Plaintiff-Appellee,*

*v.*

SALESFORCE.COM, INC., DELL, INC., DR. PEPPER SNAPPLE GROUP,
INC., KIMBERLY-CLARK CORPORATION, NBCUNIVERSAL, INC.,
LIVINGSOCIAL, INC., FEDEX CORPORATION, BMC SOFTWARE, INC.,
BANK OF AMERICA CORPORATION, BANK OF AMERICA NATIONAL
ASSOCIATION, MERRILL LYNCH & CO., INC., MERRILL LYNCH,
PIERCE, FENNER & SMITH INCORPORATED,
and FEDEX CORPORATE SERVICES, INC.,

*Defendants-Appellants.*

*Appeal from the United States District Court for the Eastern District of
Texas in No. 2:13-cv-00011-JRG, Judge J. Rodney Gilstrap*

## BRIEF FOR PLAINTIFF-APPELLEE
## VIRTUALAGILITY INC.

CHRISTIAN JOHN HURT
EDWARD K. CHIN
ANDREW JOSEPH WRIGHT
NIX PATTERSON & ROACH LLP
5215 N. O'Connor Boulevard
Suite 1900
Irving, TX 75039
(972) 831-1188

DEREK T. GILLILAND
NIX PATTERSON & ROACH LLP
205 Linda Drive
Daingerfield, TX 75638
(903) 645-7333

*Counsel for Plaintiff-Appellee*

FEBRUARY 21, 2013

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee, Christian J. Hurt, certifies the following:

1. The full name of every party or amicus represented by me is: VirtualAgility Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None

4. The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Nix Patterson & Roach, LLP; Andrew Joseph Wright; Christian J. Hurt; Derek Tod Gilliland; Edward K. Chin; Kirk Austin Voss; Nelson James Roach; Robert Winn Cutler; David Neil Smith.

DATED: February 21, 2014.        Respectfully submitted,

_____

CHRISTIAN J HURT
*Attorney for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

STATEMENT OF RELATED CASES...................................................1

JURISDICTIONAL STATEMENT.......................................................1

STATEMENT OF THE ISSUES .........................................................1

STATEMENT OF THE CASE .............................................................2

STATEMENT OF FACTS....................................................................2

    I.    The Parties .........................................................................2

    II.   The '413 Patent...................................................................4

    III.  The District Court Litigation and the CBM Proceedings ....................6

SUMMARY OF THE ARGUMENT.....................................................10

ARGUMENT ......................................................................................14

    I.    Standard of Review.............................................................14

    II.   Section 18(b) Does Not Strongly Encourage Staying
          Cases Pending CBM Review ..............................................18

    III.  The District Court Litigation and the CBM Proceedings ...................23

          A.    This Court Should Not Consider the Potential
                Contingent Claim Amendments .............................23

          B.    A Stay is Unlikely to Meaningfully Simplify This Case..........25

                1.    The CBM Proceeding is Unlikely to Actually
                      Narrow the Scope of the District Court Litigation .........25

2.    There is a Palpable Risk That This Court Will
Vacate the PTAB's Decision on Procedural Grounds....30

3.    The Defendants' Generic Arguments Fail to
Show That a Stay Will Simplify This Case...................32

C.    The Status of This Case Does Not Justify a Stay ....................36

D.    A Stay Will Unduly Prejudice VirtualAgility and
Present a Clear Tactical Advantage to the Defendants.............38

1.    A Stay Will Last Multiple Years...................................38

2.    A Stay Will Harm VirtualAgility in the Marketplace ....41

3.    A Stay Carries a Heightened Risk of Evidence Loss .....50

E.    A Stay is Unlikely to Meaningfully Reduce
the Burden on the Court and the Parties .................................52

F.    Other District Court Decisions Are of Limited Relevance.......56

CONCLUSION .................................................................................59

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alice Corp. v. CLS Bank Int'l*,
    134 S. Ct. 734 (2013) ...................................................................28

*Ambato Media, LLC v. Clarion Co.*,
    No. 2:09-cv-242, 2012 U.S. Dist. LEXIS 7558, at *4
    (E.D. Tex. Jan. 23, 2012) ......................................................38, 51

*Bancorp Servs, L.L.C. v. Sun Life Assurance Co.*,
    687 F.3d 1266, 1273 (Fed. Cir. 2012).......................................29

*Blue Calypso, Inc. v. Groupon, Inc.*,
    No. 6:12-CV-486-MHS (E.D. Tex. Jan. 16, 2014) ......................57

*Broadcom Corp. v. Qualcomm, Inc.*,
    543 F.3d 683, 702–04 (Fed. Cir. 2008).......................................48

*Broadcast Innovation, L.L.C. v. Charter Commc'n, Inc.*,
    No. 03-CV-2223-ABJ-BNB, 2006 U.S. Dist. LEXIS 46623, at *12
    (D. Col. July 11, 2006)...........................................19, 20, 23, 53

*ConocoPhillips v. United States*,
    501 F.3d 1374, 1381(Fed. Cir. 2007)..........................................42

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249, 253–54 (1992) ......................................................21

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463, 474 (1978) .............................................................15

*DataTreasury Corp. v. Wells Fargo & Co.*,
    490 F. Supp. 2d 749, 755 (E.D. Tex. 2006) ...........................34, 35

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
    511 U.S. 862, 867–68 (1994) ......................................................15

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938, 948 (1995) ............................................................15

*Function Media, L.L.C. v. Google Inc.*,
708 F.3d 1310, 1316 (Fed. Cir. 2013)........................................24

*Fusion Specialties, Inc. v. China Network Leader, Inc.*,
No. 12-CV-9-CMA-KMT, 2012 U.S. Dist. LEXIS 113712, at \*5
(D. Col. Aug. 11, 2012).................................................................20

*Gardner v. Westinghouse Broad. Co.*,
437 U.S. 478, 481–82 (1978) ......................................................15

*Gould v. Control Laser Corp.*,
705 F.2d 1340, 1341 (Fed. Cir. 1983) ........................................16

*ImageVision.Net, Inc. v. Internet Payment Exch., Inc*.,
No. 12-054-GMS-MPT, 2012 U.S. Dist. LEXIS 163234,
2012 WL 5599338, at \*4-5 (D. Del. Nov. 15, 2012) .................41

*In re NTP, Inc.*,
654 F.3d 1268, 1276 (Fed. Cir. 2011)........................................56

*Int'l Rectifier Corp. v. Samsung Elecs. Co.*,
424 F.3d 1235, 1241 (Fed. Cir. 2005)..................................16, 23

*Ladd v. United States*,
713 F.3d 648, 655 (Fed. Cir. 2013)................................46, 51, 55

*Landis v. N. Am. Co.*,
299 U.S. 248, 254–55 (1936) ......................................................16

*Landmark Tech., LLC v. iRobot Corp.*,
No. 6:13-CV-00411-JDL, Docket No. 47 (E.D. Tex. Jan. 24, 2014) ...........57

*Lopez v. Davis*,
531 U.S. 230, 240–41(2001) .......................................................14

*Market-Alerts Pty. Ltd. v. Bloomberg Fin. L.P.*,
　　No. 12-780-GMS, 2013 U.S. Dist. LEXIS 15300, at *6
　　(D. Del. Feb. 5, 2013) ....................................................19, 40, 41

*Moore U.S.A. Inc. v. Standard Register Co.*,
　　229 F.3d 1091, 1116 (Fed. Cir. 2000).........................................23

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
　　702 F.3d 1351, 1363 (Fed. Cir. 2012).........................................48

*Progressive Casualty v. Safeco Ins. Co.*,
　　2013 U.S. Dist. LEXIS 54899, at *21–28 (N.D. Ohio Arp. 17, 2013) .........58

*Proctor & Gamble Co. v. Kraft Foods Global, Inc.*,
　　549 F.3d 842, 848–49 (Fed. Cir. 2008).......................................16

*Salve Regina College v. Russell*,
　　499 U.S. 225, 233 (1991) ....................................................15

*SenoRx, Inc. v. Hologic, Inc.*,
　　No. 12-173-LPS-CJB, 2013 U.S. Dist. LEXIS 8044, 2013
　　WL 144255, at *5 (D. Del. Jan. 11, 2013) ...................................41

*Soverain Software, LLC v. Amazon.com, Inc.*,
　　356 F. Supp. 2d 660, 662 (E.D. Tex. 2005) ..................................18

*Volusion, Inc. v. Versata Software, Inc.*,
　　CBM 2013-00017 & CBM2013-00018 ............................................32

*VoltStar Techs., Inc. v. Superior Commc'ns, Inc.*,
　　No. 2:13-cv-0097, 2013 U.S. Dist LEXIS 119190, at *6
　　(E.D. Tex. Aug. 22, 2013)....................................................38

*Zedner v. United States*,
　　547 U.S. 489, 510–11 (2006) .................................................21

*Zillow, Inc. v. Trulia, Inc.*,
　　No. C12-1549JLR, 2013 U.S. Dist. LEXIS 144919, at *2
　　(W.D. Wash. Oct. 4, 2013)....................................................58

# FEDERAL STATUTES AND RULES

9 U.S.C. § 3 ...................................................................................21

10 U.S.C. § 7722 ...........................................................................22

11 U.S.C. § 362(a), (b) ..................................................................22

20 U.S.C. § 1718 ...........................................................................22

26 U.S.C. § 6863(a) .......................................................................22

28 U.S.C. §§ 1331 ...........................................................................1

28 U.S.C. §§ 1338(a) .......................................................................1

28 U.S.C. § 1659(a) .......................................................................22

30 U.S.C. § 30 ...............................................................................22

35 U.S.C. § 299 .............................................................................17

35 U.S.C. §§ 315(a)(2) .............................................................21, 54

35 U.S.C. § 321 ...............................................................................1

35 U.S.C. § 325(a)(2) .....................................................................21

37 C.F.R. § 42.71(d)(2) (2012).......................................................40

77 Fed. Reg. 48756 (Aug. 14, 2012), at 48768 ..............................39

37 C.F.R. § 42.200(c) (2012) .........................................................39

AIA §§ 18(a)(1)(E), (d)(1) .............................................................31

AIA § 18(b)(2)..........................................................................passim

AIA § 18(b)(2), Pub. L. No. 112-29, 125 Stat. 284, 331 (2011) ..............................1

AIA § 18(d)(1)...........................................................................................................7

FAR § 11.104(b).......................................................................................................44

Fed. R. App. P. 4(a)(1)(A).......................................................................................24

Fed. R. App. 10.........................................................................................................23

### OTHER AUTHORITIES

157 Cong. Rec. S1052, S1053 (daily ed. Mar. 1, 2011)...........................................17

157 Cong. Rec. S1360, S1367, S1379 (daily ed. Mar. 8, 2011) .............................17

157 Cong. Rec. S5402, 5433 (daily ed. Sept. 8, 2011) ...........................................17

157 Cong. Rec. S5402, at S5428 (daily ed. Sept. 8, 2011) .....................................31

## STATEMENT OF RELATED CASES

There are no other appeals in or from the same civil action or proceeding in the lower court or body currently pending or previously before this Court or another appellate court.  A decision by this Court in this interlocutory appeal will affect the underlying district court litigation, styled as *VirtualAgility Inc. v. Salesforce.com, Inc.*, Case No. 2:13-CV-00011-JRG, pending in the United States District Court for the Eastern District of Texas, Marshall Division.

## JURISDICTIONAL STATEMENT

This case is a patent infringement action under Title 35 of the United States Code.  The District Court had exclusive subject matter jurisdiction based on 28 U.S.C. §§ 1331 and 1338(a).  This appeal arises under Section 18(b)(2) of the Leahy-Smith America Invents Act ("AIA"), 35 U.S.C. § 321; AIA § 18(b)(2), Pub. L. No. 112-29, 125 Stat. 284, 331 (2011).

## STATEMENT OF THE ISSUES

This interlocutory appeal presents a single issue: Did the District Court err in denying the Defendants' motion to stay pending completion of CBM proceedings when (1) a stay will cause VirtualAgility—a much smaller, direct competitor of Salesforce and other defendants—to lose market share, goodwill, and a timely opportunity to obtain a permanent injunction; (2)  the patent-in-suit was considered in light of over 60 references for over twelve years by the PTO and the BPAI, and

1

issued with claims based on language provided by the PTO, and that, according to the PTAB, do not refer to a financial product or service; (4) this case was midway to trial when PTAB instituted the CBM proceeding?

## STATEMENT OF THE CASE

The Defendants-Appellants challenge the Order of the District Court denying their Motion to Stay Proceedings Pursuant to Section 18(b) of the Leahy-Smith America Invents Act. J.A. 1–17; *VirtualAgility*, No. 2:13-CV-00011-JRG, 2014 U.S. Dist. LEXIS 2286 (E.D. Tex. Jan. 9, 2014).

## STATEMENT OF FACTS

### I.   The Parties

VirtualAgility and Defendant Salesforce, as well as other defendants, directly compete in the market for business enterprise software. VirtualAgility is a small, privately owned company. J.A. 317–18. Salesforce is a large, publicly traded company with nearly $3 billion in annual revenue. J.A. 333, 363. The remaining defendants are likewise large companies. J.A. 316–17.

VirtualAgility designs, produces, and sells enterprise-level technology solutions that allow users to build and configure customized software applications for specific needs. J.A. 315. These customized applications allow users to access and share information to collaborate and cooperate effectively across geographic

and institutional boundaries.  J.A. 315–16.  VirtualAgility offers these applications and services under the VirtualAgility WorkCenter[TM] brand.

VirtualAgility entered the enterprise-level market in the late 1990s and continues to sell business enterprise software to numerous customers.  Among others, VirtualAgility's customers include state and federal agencies, such as the U.S. Customs and Border Protection, the Federal Bureau of Investigation, and the State of New Jersey.  J.A. 316.  These agencies have used VirtualAgility's technology to electronically manage law enforcement cases, projects, emergency response, among other information.  *Id.*

VirtualAgility's predecessor filed patent applications in 1999 to protect the technology that is now embodied in VirtualAgility's WorkCenter[TM] product.  It took the U.S. Patent & Trademark Office (PTO) over twelve years to issue the patent-in-suit, U.S. Patent No. 8,095,413 (the '413 patent).  The examination process included consideration of over 60 prior art references, and a successful appeal to the Board of Patent Appeals and Interferences (BPAI) where both prior art and patentable subject matter issues were addressed.  The PTO then allowed several of the claims at issue here when VirtualAgility accepted the claim language provided by the examiner pursuant to the BPAI's decision.

In the interim, companies such as Salesforce entered the market for business enterprise software, including the market for government agencies.  Over time,

Salesforce became a dominant market participant and began to partner with large companies to build customized software solutions, such as Defendants Dell and BMC Software. VirtualAgility's customers began to have discussions with VirtualAgility's President and Chief Executive Officer, Stuart Rudolph, during which they would compare the functionality of the VirtualAgility WorkCenter™ to Salesforce's products, which include Sales Cloud and Service Cloud. J.A. 317.

By 2012, when the '413 patent issued, Salesforce had acquired "two-thirds of U.S. federal Cabinet-level agencies and governments in more than 80 percent of U.S. states as users of its trusted cloud services." J.A. 316. Those customers included the State of New Jersey, a VirtualAgility customer. *Id.* In addition, VirtualAgility has received Government Service Administration (GSA) bids for enterprise-level products and services that mention Salesforce's Sales Cloud and Service Cloud products. J.A. 316; J.A. 322–27.

## II. The '413 Patent

The '413 patent covers the core computer technology in VirtualAgility's WorkCenter™ bundle of enterprise software applications, a successor product to what was known as Agile Manager when the '413 patent application was filed in 1999. The patent generally relates to computerized systems and methods that process management information. J.A. 19 (Abstract). The specification describes a software service that enables people in an enterprise to collaborate, perform

4

tasks, and achieve goals for specific activities. J.A. 61, col. 2 ll. 14–27. The invention is agnostic as to the type of beneficial results, financial or otherwise, that users might achieve through its use. *Id.*, col. 1 ll. 63–67.

The specification discloses an exemplary cloud-computing embodiment (Agile Manager) that provides a series of web-based applications that users access through an Internet browser:



J.A. 23, Fig. 3.

Using this web-based user-interface, a user can customize the goals, tasks, and other functionalities that facilitate collaboration and information sharing in an enterprise, whether a business, non-profit organization, or governmental agency. J.A. 61, col. 2. ll. 14–27. The '413 patent also discloses the underlying computer

data-structures, components, and processing that drive the system. *E.g.*, J.A. col. 7 l. 54–col. 8 l. 25; J.A. 66, col. 11 ll.11–61; J.A. 69, col. 17 ll. 24–63. The claims are likewise directed to that computer implementation, reciting that a "processor" and "storage device" of the claimed system store and manipulate a number of data structures, including "model[s] of a collaborative activity" and "model entities" that are organized into a "plurality of hierarchies." *E.g.*, J.A. 69, claim 1.

### III.    The District Court Litigation and the CBM Proceedings

VirtualAgility filed this lawsuit on January 4, 2013 against Salesforce and its major partners and customers. VirtualAgility accused the Sales Cloud and Service Cloud line of products of infringing the '413 patent. The Defendants did not immediately file a petition for CBM review. Rather, after seeking extensions of time to answer, they filed multiple procedural motions, namely, a motion to dismiss and a motion to transfer. J.A. 85–86. Four months after learning of this lawsuit, Defendant Salesforce filed its petition to initiate Covered Business Method Review ("CBM") proceedings for the '413 patent and, shortly thereafter, filed its motion to stay. J.A. 88. At that time, the Patent Trial & Appeal Board (PTAB) had not considered the CBM petition.

Salesforce's petition lacked a number of prior art references that Salesforce was aware of. The petition contained only two references that supposedly invalidated the '413 patent claims under §§ 102 and 103—*Managing Projects with*

6

*Microsoft Project 4.0*, by Gwen Lowry (the Lowry reference) and U.S. Patent No. 5,761,674 (the Ito reference)—and raised § 101 issues.  J.A. 573–94.  The Lowry reference was one of over 60 references considered by the PTO during the twelve-year prosecution of the '413 patent, J.A. 19, and the '413 patent issued over the PTO's post-*Bilski* § 101 rejection, J.A. 5.  Salesforce omitted from its petition two pieces of prior art that, as part of its motion to transfer, it represented to the District Court were "of particular importance," Oracle Projects and the Tecskor product.  J.A. 6.  Neither of those references is before the PTAB.  Nor are the nearly fifty additional references that Salesforce has put at issue in its invalidity contentions before the District Court.

The PTAB granted in part Salesforce's petition on November 9, 2013.  The PTAB first concluded that the '413 patent was eligible for CBM review, J.A. 560–69, despite acknowledging that none of the claims of the '413 patent refer to a financial product or service, the jurisdictional threshold that must be met before a CBM review can be instituted, AIA § 18(d)(1).  The PTAB, however, only instituted the CBM proceeding on two grounds, that the Ito reference may anticipate the asserted claims and that the asserted claims may fail to claim statutory subject matter under § 101.  J.A. 573–89.  The PTAB rejected all of Salesforce's § 103 arguments as well as Salesforce's contention that the Lowry reference anticipates the '413 patent claims.  J.A. 589–94.  At the time the PTAB

7

instituted the proceedings, the parties were scheduled to begin the claim construction process before the District Court.  J.A. 545.

Just over seven weeks after receiving the PTAB's decision instituting the CBM proceedings, the District Court denied Salesforce's motion to stay in a detailed, sixteen-page decision.  J.A. 1–17.  The Court found that whether the stay would simplify the litigated issues weighed "essentially neutral, if not slightly against, granting a stay in this case" after "weighing the limited benefit derived from the PTAB's prior consideration of the single prior art reference (the Ito patent) against the substantial uncertainty involved in all other aspects of the CBM review, including the § 101 determination and further in view of the two additional prior art references not before the PTAB."  J.A. 9–10.  The Court also found that, while the case was at a relatively early stage, "the benefits of a stay at this relatively early stage of the proceedings are outweighed by various other considerations."  J.A. 10.

The Court also found that "a stay would unduly prejudice VirtualAgility both in the marketplace and in this litigation," which "weigh[ed] heavily against granting a stay."  J.A. 14–15.  To reach that holding, the District Court found that defendant Salesforce and VirtualAgility "directly compete in at least the enterprise cloud computing market targeting public sector entities."  J.A. 12–13.  The Court further found that "[t]he loss of market share and consumer goodwill is particularly

8

high in the growing market of enterprise cloud-computing, where contractors and governmental agencies are developing lists of preferred vendors." J.A. 13. The Court also found a heightened possibility of evidence loss during the stay period based on the age of certain key witnesses, including, for example, the attorney who prosecuted the patent-in-suit, who is "now beyond age seventy." J.A. 14. In sum, the Court found that VirtualAgility would be unduly prejudiced by any stay due to the "irreparable loss of market share, erosion of goodwill and potential loss of key witnesses." J.A. 14–15.

Lastly, the Court found that potential for the stay to reduce the burden on the parties and the Court only weighed slightly in favor of a stay. It was not convinced that CBM review will "cancel all or even a substantial number of the asserted claims," given the thoroughness of the PTO's prior examination of the patent-in-suit, the single new prior art currently before the PTAB, and the uncertainty of the PTAB's § 101 determination. J.A. 15–16. Likewise, the Court found that "the CBM review will not substantially alleviate the existing demands upon the Court and the parties" with respect to the Oracle Projects and Tescor product references, "as neither reference is before the PTAB." J.A. 16. As a result, the Court held that "the burden on this Court and the parties, when measured in context of the overall course of this litigation, will not be substantially lessened by a stay." *Id.* The Court ultimately concluded, however, that the burden of litigation factor slightly

weighed in favor of a stay because, despite the stay's lack of potential to simplify the litigated issues, a stay would reduce the litigation burdens due to characteristics that are "inherent to all CBM reviews." *Id.*

After weighing all the factors, the District Court found that the Defendants failed to show that a stay was warranted. J.A. 167–17. The Defendants appeal the District Court's decision under Section 18(b)(2) of the AIA.

## SUMMARY OF THE ARGUMENT

The CBM provisions in the AIA were intended to address a narrow range of patents asserted under a narrow range of circumstances. The CBM process was intended to weed out patents with claims directed to a financial product or service that were of dubious quality due to the lack of robust examination in light of the lack of prior art available during examination. These types of patents were frequently asserted by non-practicing entities, and the CBM statute was enacted as a temporary measure to allow such patents to be further reviewed by the PTO.

To foster that review, the CBM statute provides that a district court may stay the litigation of a patent that is properly subject to CBM review. Notably, and unlike other AIA provisions, a stay based on a CBM review is not automatic. Rather, the statute enumerates four distinct factors that the district court weighs to determine whether a stay is appropriate. The statutory test was not a unique creation of Congress; it was based on existing case law with the addition of one

factor adopted from a district court case—the potential burden on the *parties* (not simply defendants) and the *court*.

The plain language of the CBM statute read in light of its intended purpose amply demonstrates why the Court should reject the Defendants' challenge. As the District Court noted, the '413 patent is not the type of patent the CBM process was intended to address. It was thoroughly examined in light of over 60 references, appealed to the BPAI where issues of anticipation, obviousness, and statutory subject matter were considered, and issued based on claim language provided by the examiner pursuant to the BPAI's decision. That process took over 12 years. The resulting claims do not refer to or even mention a financial product or service, and VirtualAgility is an ongoing concern that sells products embodying its patents outside the financial services sector.

Moreover, the statutory factors evince Congressional concern for circumstances where a stay, even when a CBM review has been instituted, could greatly and disproportionately disadvantage a patentee seeking to enforce its rights. The statute further requires that established precedent be followed to assure that the temporary CBM provisions are not extended to circumstances that were never intended to be captured. This case presents a textbook example such circumstances.

A stay is unlikely to simplify this case meaningfully. The CBM proceeding includes only anticipation by a single reference and § 101 rejections that the District Court rightly found appear unlikely to survive the proceeding. The Defendants in the litigation, in contrast, have raised numerous prior art references that they did not place at issue in the CBM proceeding, including two references that they represented are "of particular importance." J.A. 6. Thus, there will be full-blown litigation on invalidity issues regardless of whether a stay is in effect. Moreover, the scope of the infringement case is largely the same regardless of the number of asserted claims, as each asserted claim implicates the same accused Sales Cloud and Service Cloud products.

The status of this case does not justify a stay. At the time the PTAB initiated the CBM proceeding, this case was nearly halfway to trial. The parties were about to begin the claim construction process and had exchanged significant discovery. While the case was not on the eve of trial, the parties had expended significant effort and the District Court had placed the case on a fast schedule.

A stay will cause undue prejudice to VirtualAgility. A stay is likely to last at least two years. VirtualAgility directly competes with at least Salesforce and will likely lose market share and goodwill during the multi-year delay. A stay will also delay VirtualAgility's right to injunctive relief. Given that the '413 patent covers VirtualAgility's flagship product and that VirtualAgility is significantly

outgunned by Salesforce in the marketplace, a stay has the real potential to cause substantial prejudice. On top of that, the parties have identified a number of relevant witnesses that are of advanced age, which risks losing evidence during the stay period and hampering VirtualAgility's ability to adequately put on its case.

Lastly, a stay is unlikely to reduce the burden on the parties and the Court. Because the stay is unlikely to simplify the litigation, it is likely that the litigation post-stay will require as much or more work. CBM proceedings, by their nature, do have the potential to eliminate issues from litigation. But that quality inherent to all CBM proceedings is not a sufficient basis to stay this case in light of the other factors in the statute.

The District Court carefully weighed these factors using the flexible case-by-case framework that Congress codified in Section 18(b). Based on that careful and deliberate consideration, the Court correctly concluded that VirtualAgility is likely to be harmed disproportionately if the Defendants—its much larger competitors—are allowed to draw out this case indefinitely and further increase the tactical and competitive advantage they already have as a result of their size. There is no question that the Court's decision represents a consistent application of the law as Congress intended it.

In fact, according to the Defendants, this is the only instance out of approximately 16 cases where a stay under Section 18(b) has been finally rejected.

Certainly, 1 out of 16 indicates a consistent application of Section 18(b)'s stay provisions, which is what Defendants are seeking. The Defendants' issue with the District Court's decision boils down to the fact that it did not turn out like other cases involving different parties, different patents, different products, and different facts. That result is not surprising, however, when the statute calls for a weighing of facts on a case-by-case basis, and it provides no basis for disturbing the District Court's well-reasoned and thorough decision.

Accordingly, VirtualAgility respectfully requests that the Court affirm the District Court's decision denying the Defendants' motion to stay.

## ARGUMENT

### I.    Standard of Review

Section 18(b)(2) provides that this Court review the District Court's decision "to ensure consistent application of established precedent," and "such review may be de novo." The Court thus has the authority to engage in de novo review, but does not have the duty to do so. *Lopez v. Davis*, 531 U.S. 230, 240–41 (2001) (contrasting the "permissive 'may'" with the "mandatory 'shall'" in the same statute to conclude that the agency had "the authority, but not the duty" to perform the permissive statutory acts).

The Court should narrowly construe Section 18(b)(2) to avoid a potential flood of piecemeal appellate litigation. Courts narrowly construe statutes that

14

allow for interlocutory appeals, such as Section 18(b)(2), because they are exceptions to the final judgment rule. *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 862, 867–68 (1994); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474 (1978). In addition, the potential for de novo review in Section 18(b) interlocutory appeals further counsels towards a narrow construction. *See Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 481–82 (1978) (approaching the construction of an interlocutory appeal statute "somewhat gingerly lest a floodgate be opened").

De novo review is not appropriate in this case. The District Court's decision heavily depended on findings of historical fact. In particular, the Court issued findings regarding the disproportionate competitive disadvantage VirtualAgility faces in the market for enterprise technology covered by the '413 patent against much larger competitors such as Salesforce and other defendants.

Established precedent recognizes that district courts, as the finders of fact, are unquestionably better positioned than appellate courts to render findings of historical fact. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 948 (1995) ("[T]he reviewing attitude that a court of appeals takes toward a district court decision should depend upon 'the respective institutional advantages of trial and appellate courts.'") (quoting *Salve Regina College v. Russell*, 499 U.S. 225, 233 (1991)); *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 424 F.3d 1235, 1241 (Fed.

Cir. 2005) ("This court is unable to find facts in the first instance on appeal."). Federal Rule of Civil Procedure 52(a)(6) similarly provides for clear error review over a district court's findings of fact.

Moreover, "[t]he Supreme Court has long recognized that district courts have broad discretion" to deny motions to stay. *Proctor & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848–49 (Fed. Cir. 2008) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). The stay analysis focuses on whether it is worth investing the district court's limited judicial resources to proceed with litigating a case, and it is the district court that bears the consequences of that decision. As a result, the party appealing an order denying a stay historically faced a steep burden because the appeal seeks "interference by an appellate court with management of proceedings entrusted to the district court." *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1341 (Fed. Cir. 1983). Congress did not change this established precedent when it enacted Section 18(b). To the contrary, it specifically directed that courts should consistently apply that established precedent.

Here, there is no reason to apply de novo review to any question other than whether the District Court applied established precedent. Resolving the District Court's findings of historical fact in the first instance on appeal will not "ensure consistent application of established precedent" because those specific findings are

16

necessarily limited to this case.  Nor will resolving the Court's finding that, based on the competitive relationship between the parties, VirtualAgility will suffer undue prejudice during an extended delay.

There are certainly instances in which de novo review would be appropriate. Form example, it would be appropriate to harmonize conflicting stay decisions from two district courts that involve the same patent that is subject to CBM review. This outcome is not simply a hypothetical—the AIA affects the ability to join multiple defendants in a single proceeding, 35 U.S.C. § 299.  Resolving those conflicting decisions will ensure the consistent application of established precedent.   That is not this case.

To argue that de novo review over all issues is appropriate here, the Defendants rely solely on statements made on the Senate floor by a single Senator suggesting that de novo review is "central" to ensuring consistent application of established precedent.  Blue Br. 14–15 (quoting J.A. 254, 157 Cong. Rec. S1364).  To begin with, there were an equal volume of statements by Members, not cited by Defendants, that the CBM provisions are to be narrowly applied to ensure that unintended circumstances are not captured.  *See* 157 Cong. Rec. S1052, S1053 (daily ed. Mar. 1, 2011); 157 Cong. Rec. S1360, S1367, S1379 (daily ed. Mar. 8, 2011); 157 Cong. Rec. S5402, 5433 (daily ed. Sept. 8, 2011).  Moreover, the Defendants have not identified any ambiguity in Section 18(b) that warrants

looking to floor statements by a Member of Congress, which is only permitted as a last resort. Even so, the Defendants do not point to any reason that de novo review over factual and discretionary issues is proper in this particular case.

The District Court's decision in this case heavily depended on specific findings of fact. Accordingly, de novo review in this case should only be applied to whether the District Court properly applied established precedent.

## II. Section 18(b) Does Not Strongly Encourage Staying Cases Pending CBM Review

In addition to misreading the interlocutory appeal provision in § 18(b), the Defendants also improperly recast the statute as providing an automatic or presumptive stay. Section 18(b) does not strongly encourage courts to stay cases pending the completion of CBM proceedings. Instead, the statute explicitly requires a case-by-case analysis to determine if a stay is warranted. Historically, courts have considered three things when deciding whether to stay litigation pending a challenge to the patent at issue at the PTO: "(1) whether a stay will unduly prejudice or present a clear tactical advantage to the nonmoving party, (2) whether a stay will simplify issues in question and trial of the case, and (3) whether discovery is complete and whether a trial date has been set." *Soverain Software, LLC v. Amazon.com, Inc.*, 356 F. Supp. 2d 660, 662 (E.D. Tex. 2005) (Davis, C.J.). The statutory test under the AIA "closely resembles the stay analysis

courts have applied in assessing a motion to stay pending *inter partes* or *ex parte* reexamination by the Patent and Trademark Office." *Market-Alerts Pty. Ltd. v. Bloomberg Fin. L.P.*, No. 12-780-GMS, 2013 U.S. Dist. LEXIS 15300, at *6 (D. Del. Feb. 5, 2013) (Sleet, J.). In determining whether to grant a motion to stay litigation pending resolution of a CBM Review, the statute instructs courts to consider four statutory factors:

1. Whether a stay, or the denial thereof, will simplify the issues in question and streamline trial;

2. Whether discovery is complete and whether a trial date has been set;

3. Whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and

4. Whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court.

AIA § 18(b)(1). There is not one factor that is controlling—the totality of the circumstances governs. *Broadcast Innovation, L.L.C. v. Charter Commc'n, Inc.*, No. 03-CV-2223-ABJ-BNB, 2006 U.S. Dist. LEXIS 46623, at *12 (D. Col. July 11, 2006) (applying 4-factor test). The key difference between the statutory test and the test employed by courts in the ordinary patent reexamination context "is the inclusion of a fourth factor." *Market-Alerts*, 2013 U.S. Dist. LEXIS 15300, at *7. The legislative history of the AIA suggests that the additional "burden of litigation" factor represents "the sole statutory modification to the analysis." *Id.* at

*7 n.6. The AIA does not alter the way in which district courts assess the first three factors.

The statutory test established in Section 18(b) was explicitly adopted from the four-factor test from the 2006 district court decision in *Broadcast Innovation*. J.A. 3 (citing 157 Cong. Rec. S1360-02). Regarding the "burden of litigation" factor, the *Broadcast Innovation* Court noted, however, that "most courts merge this inquiry with the 'simplification of the issues' factor." 2006 U.S. Dist. LEXIS 46623, at *13 n.6; *see also Fusion Specialties, Inc. v. China Network Leader, Inc.*, No. 12-CV-9-CMA-KMT, 2012 U.S. Dist. LEXIS 113712, at *5 (D. Col. Aug. 11, 2012) (applying four-factor test and noting "courts often collapse the first and fourth factors"). That approach makes sense. If granting a stay is unlikely to simplify the issues and streamline trial, then it follows that a stay will not reduce the burden of litigation. In view of the statute's plain text, the Defendants are simply incorrect when they argue that Section 18(b) sets a "substantially lower standard" than the prior stay-pending-reexamination analysis. Blue Br. at 17.

The Defendants contend that the AIA strongly encourages stays pending CBM review based on floor statements by Senator Schumer that Section 18(b) "places a very heavy thumb on the scale in favor of a stay being granted" and that a stay should issue "absent some exceptional circumstance." Defendants' Br. at 17–18 (quoting 157 Cong. Rec. S1363–64). It is inappropriate to consider these

20

statements.    The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says.   When the words of a statute are unambiguous, then, this first canon of construction is also the last: judicial inquiry is complete."   *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).   "[W]hen the language of the statute is plain, legislative history is irrelevant."   *Zedner v. United States*, 547 U.S. 489, 510–11 (2006) (Scalia, J., concurring-in-part).   The plain language of Section 18(b) lacks any ambiguity that justifies looking to floor statements by a single Senator to re-tool the text.   Indeed, the Defendants do not even attempt to point to any ambiguity.

The four-factor test in the statute plainly states what factors a court should consider.   Congress did not make the grant of a stay automatic, place any presumptions in favor of a stay, or codify any text that puts the heavy thumb on the scale in favor of a stay.   Congress easily could have memorialized those concepts into the words of the statute.   It could have expressly provided that the litigation "shall be stayed absent an exceptional circumstance."   Indeed, the two other stay provisions in the AIA expressly provide that litigation "shall be automatically stayed" pending *inter partes* review or post-grant review in certain circumstances. 35  U.S.C.  §§  315(a)(2),  325(a)(2).    Numerous  other  federal  statutes  likewise provide for mandatory or presumptive stays.   *E.g.*, 9 U.S.C. § 3 (providing that the

court, upon being satisfied that an action is referable to arbitration, "shall . . . stay the trial of the action" pending completion of arbitration proceedings); 10 U.S.C. § 7722 (providing that, in time of war, all proceedings in certain lawsuits "shall be stayed"); 11 U.S.C. § 362(a), (b) (providing an "[a]utomatic stay" upon the filing of a bankruptcy petition with specific enumerated exceptions); 20 U.S.C. § 1718 (providing that termination of school transportation orders "shall be stayed pending a final appeal"); 26 U.S.C. § 6863(a) (providing that collection actions "shall be stayed" if the taxpayer posts an adequate bond); 28 U.S.C. § 1659(a) (providing that "the district court shall stay" a civil action involving claims at issue in proceedings before the International Trade Commission); 30 U.S.C. § 30 (providing that adverse claims "shall be stayed until the controversy shall have been settled or decided by a court of competent jurisdiction").

Congress declined to adopt such a rigid approach in Section 18(b). It instead endorsed the flexible case-by-case analysis from the *Broadcast Innovation* decision. That is the text that Congress passed and the President signed. The Court should not place an additional gloss on that text based upon what a Senator remarked on the Senate floor.

### III.    The Court Did Not Err When It Denied the Defendants' Motion to Stay Pending the Completion of CBM Proceedings

The Defendants fail to show any error in the District Court's decision denying their motion to stay.  Whether plainly applying the four factors in Section 18(b) or (wrongly) requiring exceptional circumstances to defeat a stay motion, none of the four factors in the statute justifies staying this case.

### A.    This Court Should Not Consider the Potential Contingent Claim Amendments

As an initial matter, this appeal is limited to the record that was before the District Court when it denied the Defendants' motion to stay.  "This court is unable to find facts in the first instance on appeal," *Int'l Rectifier*, 424 F.3d at 1241, and Section 18(b)(2) likewise constrains this appeal to the review of the District Court's decision.  Despite these constraints, the Defendants make much in their Opening Brief that, after the District Court denied the Defendants' motion to stay, VirtualAgility filed a contingent motion to amend the claims.  That fact, however, was not before the District Court, and this Court should decline to consider the import of that fact on appeal.  Fed. R. App. 10; *Moore U.S.A. Inc. v. Standard Register Co.*, 229 F.3d 1091, 1116 (Fed. Cir. 2000) (concluding that "[i]ntrusions into a district court's trial management are rarely appropriate on appeal" and denying the appellant's attempt to supplement the record with "evidence . . . that was not before the district court").

There is no circumstance that justifies considering facts that the Defendants failed to timely raise in this litigation. The Defendants contend that this Court can take judicial notice of the potential contingent amendments, citing the established rule that "[i]t is proper to take judicial notice of a decision from another court or agency." *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1316 (Fed. Cir. 2013). But the potential amendments are not a decision from the PTAB; they are an agency filing by a party.

The Defendants also knew of the potential amendments well before the deadline to file their Notice of Appeal but declined to timely raise them before the District Court. Under the schedule for CBM proceedings, VirtualAgility informed Salesforce at the initial conference on December 3, 2013—approximately two weeks after the CBM proceeding was instituted—that it might seek to amend the claims. The Defendants' motion to stay was pending at that time, but they declined to notify the District Court.

Thereafter, per the schedule in the CBM proceeding, VirtualAgility filed a formal motion with the PTAB on January 22, 2014, about two weeks after the District Court's Order and well within the thirty-day period that the Defendants had to file a Notice of Appeal. Fed. R. App. P. 4(a)(1)(A). The Defendants knew of that deadline and that VirtualAgility might seek amendment at that time. But rather than provide the District Court with the opportunity to determine how the

potential claim amendments might affect the stay analysis, the Defendants filed an immediate Notice of Appeal and rushed to this Court to seek resolution of those factual issues in the first instance.

This Court should not reward that choice. There is no reason to review the District Court's decision on a ground that was not before the Court and that the Defendants certainly could have raised prior to this appeal.

## B.    A Stay Is Unlikely to Meaningfully Simplify This Case

The District Court rightly found that the stay pending completion of the CBM proceeding is unlikely to actually simplify this case. The CBM proceeding is unlikely to actually narrow the litigated issues in the District Court litigation. In addition, due to the newness and uncertainty surrounding CBM proceedings and the PTAB's jurisdiction, there is a substantial risk that this Court will vacate the PTAB's findings in this CBM proceeding. Lastly, none of the Defendants' generic arguments about the potential for CBM proceedings to narrow the litigated issues shows that the District Court erred.

### 1.    The CBM Proceeding is Unlikely to Actually Narrow the Scope of the District Court Litigation

The CBM proceeding is unlikely to actually narrow the litigated issues. The proceeding is limited in scope—two invalidity issues—and will not narrow the infringement or damages issues for trial. While each patent claim has different

25

coverage, the scope of the case is largely the same whether the parties litigate one asserted claim or all asserted claims.  Each asserted claim implicates the same accused Sales Cloud and Service Cloud products for each Defendant.  As a result, regardless of which claims are asserted, the parties will take detailed discovery on the technical and financial aspects of those products.  An infringement trial on one asserted claim will be largely indistinguishable from a trial on all asserted claims.

VirtualAgility has served Infringement Contentions against each Defendant named in this lawsuit.  Within each set of Infringement Contentions, the same instrumentalities are alleged to infringe each asserted claim.  Thus, as long as a single asserted claim survives the CBM proceeding, no Defendant will enjoy the benefit of a decreased scope of infringement allegations.[1]  The Defendants do not argue otherwise in their Opening Brief.

A stay is also unlikely to simplify the invalidity side of the case.  Only one prior art reference is at issue in the CBM proceedings—the Ito reference—on a single ground, anticipation.  The Ito reference is largely cumulative of the "breadth of prior art references" that the PTO considered during prosecution, including the Lowry reference.  J.A. 5.  Thus, as the District Court found, it is sufficiently likely

---

[1]     Notably, the PTO's institution decision addressed only one dependent claim, leaving 15 dependent claims that have yet to be even preliminarily considered. *See* J.A. 585–89.

that at least one of the asserted claims will overcome the rejections based on Ito, either before the PTAB or before this Court on appeal.  J.A. 6.

The Defendants heavily rely on the fact that all of the Defendants (by stipulation) will be estopped from re-raising anticipation based on the Ito reference in the District Court, arguing that the estoppel will simplify this litigation even if the Ito reference does not invalidate the '413 patent claims in the CBM proceeding. That is incorrect.  The Defendants' prior art case will require the same amount of work whether or not the Ito reference is at issue.  The Ito reference is only one of almost fifty prior art references that the Defendants have placed at issue in the District Court, including Oracle Projects and the Tecskor product, which the Defendants represented to the District Court were "of particular importance."  J.A. 6.  Salesforce did not put any of those references at issue in the CBM proceeding, and the Defendants can raise those references after the CBM proceeding completes.

Moreover, the District Court has issued a General Order that requires defendants to narrow their prior art case to a total of twelve references per patent by the time of claim construction and six references per patent prior to service of their invalidity expert report.  General Order No. 13-20, *available at* http://www.txed.uscourts.gov/cgi-bin/view_document.cgi?document=24166.  With or without the Ito reference, the Defendants are well north of those two limits,

meaning that, regardless of the estoppel provisions, the parties will litigate twelve prior art references prior to expert reports and then six prior art references thereafter. Nor do the CBM proceedings include any invalidity grounds under §§ 103, 112, and 256, each of which the Defendants have asserted in the litigation, or any equitable defenses. Even with the Ito reference out of the case, there will still be full-blown litigation on invalidity issues.

It is also unlikely that the PTAB's consideration of § 101 issues will actually simplify this litigation. As the District Court noted, § 101 law is "a complex an unsettled area of law." J.A. 7. It is uncertain whether the PTAB will hold firm on its initial § 101 determination or, applying the case law as it will exist later this year, will reverse course. Should the PTAB ultimately decide that the '413 patent fails to claim patent-eligible subject matter, it is likewise uncertain whether the PTAB's final § 101 decision will withstand scrutiny on appeal to this Court, especially in light of an expected decision by the Supreme Court in *CLS Bank*. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 734 (2013). Regardless of how strong the Defendants believe their § 101 arguments are, the uncertainty surrounding § 101 and its application weighs against finding that the Defendants have met their burden to show that the CBM proceedings are likely to simplify this case.

Indeed, applying current case law, the District Court concluded that the '413 patent likely claims patent-eligible subject matter. J.A. 7–9. The Defendants do

not challenge the substance of that analysis in their Opening Brief.  They instead fault the District Court for "second-guess[ing]" the PTAB's contrary initial decision.  Blue Br. at 23.  But the PTAB's initial decision is not the final decision in the CBM proceeding—the PTAB still has to issue a final agency decision on the § 101 issues and, even then, any final PTAB decision will be subject to de novo review in this Court.  *Bancorp Servs, L.L.C. v. Sun Life Assurance Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).  The District Court simply found that the PTAB's initial § 101 determination is unlikely to remain in effect through the completion of that process, making it unlikely that the CBM proceedings will eliminate claims.

The Defendants contend, however, that even if the '413 patent claims are held patent-eligible in the CBM proceedings, the litigation before the District Court will still be simplified because the Court will not need to consider § 101 issues at all.  That may be correct, but eliminating § 101 issues from the case will not produce substantial cost savings, especially when balanced with the prejudice to VirtualAgility from a multi-year delay and the burden on the parties and the District Court to wade through a ballooned prosecution history.  Section 101 issues almost never require a detailed factual record, and the determination is based on the four corners of the patent.  Compared to the voluminous discovery on the functionality of the accused systems, their economic value, and the state of the prior art and its teaching, patent-specific § 101 issues encompass only a small

portion of the litigation workload. They are also rarely, if ever, a focus at trial. Thus, eliminating § 101 issues will not substantially simplify this case should an asserted claim emerge from the CBM proceedings.

### 2. There is a Palpable Risk That This Court Will Vacate the PTAB's Decision on Procedural Grounds

Layered on top of the risk that the merits determinations in the CBM proceedings will not meaningfully simplify this case is the fact that the CBM proceedings are relatively new and that this Court has yet to review the PTAB's procedural holdings. As a result, there is a palpable risk that the PTAB's decision will be vacated. *See* Docketing Statement (Docket No. 18), *Versata Development Group, Inc. v. SAP Am., Inc.*, No. 14-1194 (challenging on appeal, among other issues, PTO and PTAB jurisdictional law regarding what constitutes a "covered business method patent" under Section 18, the PTAB's use of the "broadest reasonable construction" standard in CBM proceedings, and the PTAB's holding that Section 18 provides it with the authority to review claims under § 101).

One source of that risk is the PTAB's jurisdiction to initiate CBM proceedings. CBM proceedings are jurisdictionally limited by statute to only certain types of business method patents. Namely, the PTAB may only institute CBM proceedings for "covered business method patents," which the statute defines as patents that claim a method or system for "performing data processing or other

operations used in the practice, administration, or management of a financial product or service." AIA §§ 18(a)(1)(E), (d)(1). The statute, however, expressly carves out from the PTAB's jurisdiction "patents for technological inventions." *Id.*

The '413 patent is not a covered business method patent. The patent relates to computer software that structures digital data in a way to enable users to share information and collaborate. It is not related to data operations used in a "financial product or service," and it is a "technological innovation"—computer software that structures data to enable the organizing, tracking, and sharing of important information. Indeed, the District Court recognized that the '413 patent, due to its extensive twelve-year prosecution in light of over 60 references, fell outside the purpose of the CBM program to review patents that had not "been thoroughly reviewed at the PTO due to a lack of the best prior art." J.A. 5 (quoting 157 Cong. Rec. S1360–62); *see also* 157 Cong. Rec. S5402, at S5428 (daily ed. Sept. 8, 2011) (statements by Senators Durbin and Schumer that "patents to develop novel software tools and graphical user interfaces" are not the target of Section 18, especially if the patentee has commercialized the patent).

VirtualAgility will continue to challenge the PTAB's determination that the '413 patent is eligible for CBM review. While that legal issue is not ripe in this appeal, the risk that the PTAB lacks jurisdiction over the CBM proceeding—which

will result in the vacating of all of its findings—further counsels against reversing the District Court's decision.

### 3. The Defendants' Generic Arguments Fail to Show That a Stay Will Simplify This Case

Realizing that the specific facts of this case break against them, the Defendants raise two generic arguments for why a stay will simplify this litigation. First, they argue that the CBM proceedings may affect the scope of the claims, as "VirtualAgility seeks to amend its claims." Blue Br. at 19–20. Second, they contend that like reexaminations, the CBM proceedings are highly likely to result simplifying the issues. Both arguments lack merit.

The Defendants' "amendment" argument is both procedurally improper and substantively incorrect. As explained above, the potential, contingent claim amendments were not part of the record before the District Court (though they could have been), and the Court did not pass on them in rendering the decision on appeal.

The Defendants' assertions regarding the potential claim amendments are also inaccurate. It is true that VirtualAgility has filed a "Contingent Motion to Amend" a number of claims with the PTAB, which the PTAB may or may not grant. PTAB law does not provide VirtualAgility with the ability to amend the claims as a matter of right. *Volusion Inc. v. Versata Software, Inc.* (CBM 2013-

00017 & CBM2013-00018, Paper 26). The request is also a narrow one. First, the

motion only seeks amendment of three asserted independent claims *in the alternative*, *i.e.*, only if the PTAB holds firm on its initial determination. *See* Exhibit 1 to Letter from Appellee VirtualAgility (Docket No. 22), at 5–6, No. 14-1232. And even if those amendments are entered, the motion does not seek to amend twelve of the twenty-one asserted claims. *Id.* Thus, a number of asserted claims before the PTAB will not be amended in either case.

Second, the potential amendment only affects one claim term—"is capable of"—and simply clarifies related claim language. Exhibit 1 to Letter from Appellee VirtualAgility (Docket No. 22), at 5–6, No. 14-1232. Namely, the proposed, contingent amendments "remove the 'is capable of' phrase prior to the limitations requiring a model entity or a representation of a model entity to belong to two different hierarchies of two different types to make it clear that the model entities are not only capable of belonging to two such hierarchies in the claimed invention but do belong to two such hierarchies." *Id.* at 5. That limitation was already implied in the claims, as indicated by the specification support cited in the contingent motion. *Id.* at 7. The potential amendments also reinforce that the claimed "processor" and related computing elements meaningfully limit the claims. *Id.*

Neither of these issues relates to any claim construction issues pending before the District Court, and the Defendants have not argued as much in their Opening Brief. Moreover, the contingent motion sets out the specification support for each potential amendment. *Id*. at 6-9. Accordingly, there is nothing to suggest that the contingent clarifying amendments, if granted, will have any material impact on claim construction. Thus, while the Defendants harp on these "amendments" in the abstract, the reality is that the potential, contingent amendments are unlikely to have a meaningful impact on the litigation before the District Court.

Lastly, the Defendants' generic arguments linking CBM proceedings and reexaminations actually show that the CBM proceeding is unlikely to meaningfully simplify this litigation. The Defendants assert that "[c]ourts have long recognized that staying litigation pending patent reexamination streamlines issues, and CBM review is no different." Blue Br. at 18. In support, they cite former Chief Judge Folsom's decision in *DataTreasury Corp. v. Wells Fargo & Co.*, 490 F. Supp. 2d 749, 755 (E.D. Tex. 2006), in which the Court granted the Defendants' motion to stay pending reexamination. That case, however, shows that the District Courts' experience with analogous reexaminations tilts towards upholding the District Court's docket management decision in this case.

In *DataTreasury*, the Court accepted the Defendants' assertion here that a stay was proper because the PTO proceedings "will likely narrow or eliminate many of the issues" related to the patents-in-suit.  490 F. Supp. 2d at 752, 754–55.  The asserted patents, however, emerged from the proceedings with the validity of every claim confirmed.  Nothing was simplified.  Instead, an already complex multi-defendant patent case became more complex.

After the lift of the stay, the Court explained that the experience taught a "valuable lesson never to stay cases absent very unusual circumstances":

> I had a learning experience from this.  You know, I think this is the first case that I have, well, I know it is, that I have stayed and then it came out of reexam.  And I recall everyone promising me this was going to simplify the case and make it a lot easier.  And I know that was in good faith, but I learned a valuable lesson never to stay cases absent very unusual circumstances for purposes of reexam.  It only complicated the claim construction work with all the various arguments that arose as a result of the reexam process.  So those of you who are routinely filing motions for reexam, you can rest assured on most occasions they will be denied.  I won't have a flat policy, but that's going to be the general rule.

*DataTreasury Corp. v. Fiserv, Inc.*, Case No. 2:13-CV-431 (Docket No. 183-2), at 5–6 (E.D. Tex. Jan. 30, 2014) (May 19, 2009 Status Conference and Motion Hearing Transcript).  The Defendants ignore that lesson and assert that a stay here will simplify the issues in this case.  They contend that, like reexaminations, the record in the CBM proceeding could contain "valuable statements that will

simplify the District Court's job of claim construction." Blue Br. at 11. But the experience in *DataTreasury* shows that a stay is more likely to "only complicate[]" the claim construction issues, especially for the District Court. The likely outcome is that the stay will force the parties and the Court to wade through a more voluminous PTO record. That result will not simplify the issues or lessen the burden in the litigation. It will only delay and increase that burden.

## C.     The Status of This Case Does Not Justify a Stay

The status of this case does not justify a stay. At the time the PTAB instituted the CBM proceedings, the parties were nearing the claim construction process, were engaged in fact discovery, and trial was set for November, 2014. J.A. 543–44. The case had been pending for nearly a year. The District Court had the case on a fast schedule.

The Defendants fault the District Court for finding that the status of the case factor only "weigh[ed] in favor of granting a stay," J.A. 10, instead of "heavily" favoring a stay, Blue Br. 25–27. They argue that the District Court erred because it considered the status of the case at the time of the decision, rather than the time of the Defendants' motion. That argument lacks merit.

The PTAB had not even considered Salesforce's CBM petition at the time of the Defendants' motion, and at that time, there was no indication whether and to what extend the PTAB would institute the CBM proceedings. Indeed, had the

District Court considered the Defendants' motion at the time it was filed, the Court would have denied the motion as premature according to the very precedent cited by Defendants. *See* Blue Br. at 30 n.17. Denial, in fact, would have been fully justified because the PTAB rejected all but two of the invalidity grounds raised in Salesforce's petition. There is no reason that the District Court should have evaluated the Defendants' motion before the PTAB had even considered the petition, let alone instituted the CBM proceedings.

VirtualAgility ultimately disagrees with the District Court, however, that the status of the case actually favored a stay. At best, this factor was neutral given that, by the time the PTAB instituted the CBM proceedings, the parties were involved in fact discovery and were preparing for the claim construction process. The case was approximately halfway to trial. In addition, the parties in the CBM Review are participating in discovery related to those proceedings. That same discovery could be relevant to the proceedings before the District Court, both of which are moving in parallel. As a result, any reduction of the burden of litigation will be significantly minimized. However, the District Court properly declined to stay this case after weighing the other factors, none of which warrant staying this case.

### D.    A Stay Will Unduly Prejudice VirtualAgility and Present a Clear Tactical Advantage to the Defendants

VirtualAgility and Salesforce are direct competitors, and a stay in this case is likely to be lengthy.  During that extended delay, the stay will unduly prejudice VirtualAgility by causing it to lose goodwill and market share and by forcing it to continue to compete against products that incorporate and infringe its own invention.  The stay will provide Salesforce and its business partners at least two additional years to dominate the market using VirtualAgility's patented technology.  It is also more likely that witnesses become unavailable, memories fade, and evidence becomes lost during a multi-year stay.  That will provide the Defendants with a tactical advantage because it will hamper VirtualAgility's ability to effectively put on its case.  Recognizing these realities, the District Court properly found that this factor "weighs heavily against a stay." J.A. 14–15.

### 1.    A Stay Will Last Multiple Years

A stay pending the completion of CBM proceedings is likely to be lengthy, which will prejudice VirtualAgility's "interest in the timely enforcement of its patent rights." *VoltStar Techs., Inc. v. Superior Commc'ns, Inc.*, No. 2:13-cv-0097, 2013 U.S. Dist LEXIS 119190, at *6 (E.D. Tex. Aug. 22, 2013) (quoting *Ambato Media, LLC v. Clarion Co.*, No. 2:09-cv-242, 2012 U.S. Dist. LEXIS 7558, at *4 (E.D. Tex. Jan. 23, 2012)).  The Defendants argue that any stay will be

relatively short because the PTAB's final decision is due no later than November 19, 2014.  Blue Br. at 28.  The November, 2014 decision, however, is not the final decision in the CBM proceeding, and the proceedings are unlikely to be final before early 2016.

The Defendants seek a stay that lasts until the CBM proceedings are final through judicial appeals.  Rehearing requests, extensions of time, and a Federal Circuit appeal have the potential to delay the resolution of the CBM proceedings by at least 12 to 20 months past the November, 2014 deadline.  First, the November, 2014 deadline "may be extended up to six months for good cause." J.A. 307, 77 Fed. Reg. 48756 (Aug. 14, 2012), at 48768 (*see* "Section O. Final Decision"); 37 C.F.R. § 42.200(c) (2012).  In addition, a "final written decision" is not necessarily the final agency decision because "a party dissatisfied with a decision of the Board may file a request for rehearing."  *Id.*  If a request for rehearing is sought, then it must be sought "within 30 days of the entry of a final decision."  37 C.F.R. § 42.71(d)(2) (2012).  Once received, the request for rehearing will be "decided approximately one month after receipt of the request." *See* J.A. 307, 77 Fed. Reg. 48756 (Aug. 14, 2012), at 48768.  Thereafter, any party to the CBM proceeding can appeal an adverse decision to this Court, which will likely add another year to the stay period.

An appeal to this Court is a near certainty due to the newness of the proceedings (whose procedures this Court has yet to bless), the uncertainty in the application of § 101, and the commercial value of the '413 patent. It is unlikely that any judicial appeal will conclude before early 2016—over a year after the November, 2014 trial setting of this case. And that estimate does not account for the real risk, due to the newness of the CBM proceedings, that the PTAB's decision will be vacated due to a procedural or jurisdictional error—voiding the PTAB's decision and potentially re-starting the proceeding and the stay period.

Moreover, because Salesforce is a party to the CBM proceeding, it has the right to appeal any PTAB decision confirming that an asserted claim is patentable. That further risks prejudice to VirtualAgility by delaying its right to pursue its direct competitor for infringement of twice-allowed patent claims.

The Defendants assert that administrative delay, by itself, does not constitute undue prejudice, citing a number of district court decisions in the stay-pending-reexamination context. Blue Br. 29–30. That maxim is generally correct, and the District Court expressly applied that precedent in reaching its decision. J.A. 11 ("[T]he potential for delay does not, by itself, establish undue prejudice. . . .," quoting *Market-Alerts*, 922 F. Supp. 2d at 494). The facts of this case, however, show that, as a result of an extended delay, VirtualAgility will be unduly prejudiced and that the Defendants will have a tactical advantage in the litigation.

### 2. A Stay Will Harm VirtualAgility in the Marketplace

A stay will unduly prejudice VirtualAgility because it will provide Salesforce—VirtualAgility's direct competitor and the dominant player in the market—with multiple years to compete against VirtualAgility using VirtualAgility's patented technology. The Defendants admit that the relationship between the parties is a relevant consideration in the prejudice analysis, Blue Br. at 28, and "[c]ourts are generally reluctant to stay proceedings where the parties are direct competitors." *Market-Alerts,* 2013 U.S. Dist. LEXIS 15300, at \*24; *see also ImageVision.Net, Inc. v. Internet Payment Exch., Inc*., No. 12-054-GMS-MPT, 2012 U.S. Dist. LEXIS 163234, 2012 WL 5599338, at \*4-5 (D. Del. Nov. 15, 2012). In these cases, "there is a reasonable chance that delay in adjudicating the alleged infringement will have outsized consequences to the party asserting infringement has occurred, including the potential for loss of market share and an erosion of goodwill." *SenoRx, Inc. v. Hologic, Inc*., No. 12-173-LPS-CJB, 2013 U.S. Dist. LEXIS 8044, 2013 WL 144255, at \*5 (D. Del. Jan. 11, 2013).

The Defendants do not challenge the District Court's recitation of that established district court precedent. *See* J.A. 11–12 (collecting cases). The Defendants instead argue that a stay will not harm VirtualAgility in the marketplace because the District Court erred in finding that VirtualAgility showed that it and Salesforce are direct competitors and, as a result, that VirtualAgility will

lose market share and goodwill during the stay period.  To begin with, the Defendants only raised a skeletal version of their "competitor" arguments in a footnote in their Reply brief before the District Court, J.A. 460 n.5, which is "not sufficient . . . to preserve [those] argument[s] for review," *ConocoPhillips v. United States*, 501 F.3d 1374, 1381 (Fed. Cir. 2007).  Regardless, there can be no question based on the evidence of record as to the veracity of the District Court's findings.

VirtualAgility put forth ample evidence to support the District Court's finding that VirtualAgility and Salesforce are direct competitors and that a stay will unduly prejudice VirtualAgility.  Before the District Court—and prior to obtaining any discovery from the Defendants—VirtualAgility relied on the declaration of Stuart Rudolph, VirtualAgility's President, Chief Executive Officer, and Chairman of the Board of Directors.  J.A. 314–451.  Mr. Rudolph has been the President of VirtualAgility since 2004 and, prior to that, was the President of VirtualAgility's predecessor.  J.A. 314–15.  Because VirtualAgility is a small company, Mr. Rudolph is very much involved in the day-to-day operations of the company and has personal knowledge regarding VirtualAgility's products, its customers and potential customers, and the marketplace spanning over a decade.  J.A. 315.

Mr. Rudolph's declaration and its two exhibits—a government bid that VirtualAgility received naming Sales Cloud and Service Cloud as the "branded products" and Salesforce's 2013 Annual Report filed with the Securities and Exchange Commission (SEC)[2]—establish that VirtualAgility and Salesforce are direct competitors.    Mr. Rudolph testified that he has "personally had conversations with VirtualAgility customers and potential customers in which the customer or potential customer compares the functionality of VirtualAgility's products with that of Salesforce's products." J.A. 317. Many of those customers include federal and state agencies. Among others, VirtualAgility has sold its products to the U.S. Customs and Border Protection, the Federal Bureau of Investigations, and the State of New Jersey. J.A. 316. As of 2012, Salesforce had acquired "two-thirds of U.S. federal Cabinet-level agencies and governments in more than 80 percent of U.S. states as users of its trusted cloud services." *Id.* Those customers included the State of New Jersey. *Id.*

In addition, Salesforce's Sales Cloud and Service Cloud products have been the brand name reference product in GSA bids that VirtualAgility received as recently as January, 2013. *E.g.*, J.A. 322–27. To obtain the government contract,

---

[2]    The District Court took judicial notice of Salesforce's 2013 Annual Report. J.A. 12. However, that Report was also in the record before the District Court as an exhibit to Mr. Rudolph's declaration. *See* J.A. 332–451.

the offeror must provide services that at least meet the functionality of the brand name listed in the solicitation. FAR § 11.104(b). Mr. Rudolph also testified that Salesforce frequently appears in GSA bids that VirtualAgility receives. J.A. 316. Defendant Dell also has contracts with various public sector entities, and is a Salesforce "Platinum Partner" that acts as a reseller of Salesforce's products and provides technical assistance in configuring and integrating those products. J.A. 317.

Salesforce's own statements corroborate that it directly competes with VirtualAgility. VirtualAgility sells cloud-based "enterprise-level information technology solutions that allow users to build and configure user-defined computer and software applications for specific needs." J.A. 12 (quoting J.A. 315–16). Its flagship product, VirtualAgility WorkCenter$^{TM}$, embodies the '413 patent claims. J.A. 317. Likewise, Salesforce's Annual Report describes the company as "a provider of enterprise cloud computing solutions." J.A. 12 (quoting J.A. 339. It identifies Sales Cloud and Service Cloud as it "primary service offerings." J.A. 339.

Salesforce's Report also identifies the "competition" for Salesforce's offerings. J.A. 344. The Report explains that Salesforce's "principal competitors" include "enterprise software vendors" and "cloud computing application service providers." *Id.* The Report states that Salesforce "may encounter competition

44

from enterprise software vendors and online service providers who may develop toolsets and products that allow customers to build new apps that run on the customers' current infrastructure or as hosted services." J.A. 12 (quoting J.A. 344). VirtualAgility is one such "enterprise software vendor and online service provider," a fact that the Defendants do not dispute. J.A. 12.

The Defendants protest that this evidence is "thin, circumstantial, flawed, and conclusory," Blue Br. at 33, but Salesforce has never denied that it competes directly with VirtualAgility, and indeed has never presented any evidence to the District Court to establish that it does not. To the contrary, the Defendants have admitted that they do not yet have a sufficient basis to dispute VirtualAgility's claim of direct competition, because they "have not yet completed discovery." Blue Br. at 33.[3] That fact alone counsels against staying this case.

The Defendants now attempt to rely on the SEC disclosures of *other* multi-billion dollar companies that provide enterprise-level services, Oracle and Microsoft, which only list other large companies as their competitors. These reports were not before the District Court. The Defendants also argue, for the first

---

[3]        Telling of the tactical advantage the Defendants are seeking to gain is their bald assertion that they "expect that discovery . . . will bear out the flaws in VirtualAgility's claim to be a direct competitor with Salesforce," Blue Br. at 24, while simultaneously attempting to hold VirtualAgility to a post-trial burden of proof necessary to obtain a permanent injunction in order to avoid an unwarranted stay, *id.* at 30–31.

time, that VirtualAgility will not be unduly prejudiced during the stay period because there is no evidence that, should an injunction issue, VirtualAgility would gain market share in relation to these larger companies.

The Defendants failed to raise either argument before the District Court and therefore waived their right to raise those arguments before this Court.  *Ladd v. United States*, 713 F.3d 648, 655 (Fed. Cir. 2013); *see also* J.A. 133–34; J.A. 459–60.  Regardless, the fact that the SEC disclosures of other companies omit smaller market participants like VirtualAgility does not detract from the layers of evidence showing that VirtualAgility directly competes with Salesforce.  Moreover, an injunction against Salesforce—a dominant market player—and its major partners and customers would go a long way towards restoring VirtualAgility's ability to compete in the market for enterprise-level services, at the very least in the market for government customers.

The Defendants therefore instead disparage VirtualAgility for being too small: they argue that VirtualAgility does not compete with Salesforce "in any meaningful sense" and that there is no evidence that VirtualAgility can participate in the market "with any modicum of success."  Blue Br. at 33.  That, however, only proves the point: how can a much smaller company effectively compete against much larger competitors that are dismissive of the company's rights and

misappropriate the company's patented technology unless it can promptly vindicate its rights against those competitors?

As a small company with private investors, VirtualAgility is at a distinct disadvantage, which the Defendants essentially admit. J.A. 317–18; Blue Br. at 33. That problem is compounded by the fact that the '413 patent, while filed in 1999, did not issue until early 2012. *Id.* In that time frame, Salesforce and Dell made significant inroads into the same markets where VirtualAgility markets and sells its products, and gained significant market share, as shown by Salesforce's published revenues. *Id.*; *see also* J.A. 363 (showing revenue growth from $984,574,000 in 2009 to $2,868,808,000 in 2012). Should a stay issue, their market presence will only increase and VirtualAgility's will continue to decrease. "The loss of market share and consumer goodwill is particularly high in the growing market of enterprise cloud-computing, where contractors and governmental agencies are developing lists of preferred vendors." J.A. 13; *see also* J.A. 350 (stating that "[t]he market for enterprise applications and platform services highly competitive," and that Salesforce may lose customers to competitors that "may be able to respond more quickly and effectively" to "changing opportunities, technologies, standards or customers requirements").

The competitive relationship between VirtualAgility and the Defendants has two primary consequences. It indicates that, during the stay period, VirtualAgility

will continue to lose market share and good will.  J.A. 11, 13–14.  It also indicates that the stay will unduly prejudice VirtualAgility by delaying its ability to obtain a permanent injunction by at least two years.  "Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012); *see also Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 702–04 (Fed. Cir. 2008) (upholding the district court's findings of irreparable harm and lack of adequate remedy at law on the basis that the parties were "direct competitor[s]").  While VirtualAgility does not have to make a showing to obtain a permanent injunction until after trial, at which point it will have received all relevant discovery from the Defendants, the limited record before the District Court shows that a permanent injunction is very likely.  The parties' competitive relationship thus strongly weighs against a stay.

The Defendants also fault VirtualAgility for not moving to expedite the District Court action or the CBM proceeding and for declining to move for a preliminary injunction.  The District Court action, however, is on a very fast schedule—the District Court set a trial date a little over one year out from the scheduling conference.  J.A. 91.  VirtualAgility has also consistently opposed the Defendants' delay tactics, including their motion to transfer (which the District

Court recently denied) and their motion to partially dismiss the Complaint for failure to state a claim.

Given the Court's quick schedule and VirtualAgility's limited resources, there was little reason for VirtualAgility to expedite the case further or move for a preliminary injunction. Indeed, the District Court properly recognized that VirtualAgility's decision to not seek a preliminary injunction had no place in the stay analysis:

> A party's decision to seek or not seek a preliminary injunction often rests upon a variety of factors, including that party's resources, the uncertainty of the outcome, or as part of an overall strategy to streamline the process and focus on other procedural steps in the litigation. Not being in a role to judge the parties' litigation strategy, the Court deems it unfair to hold VirtualAgility to a position based upon what is no more than a dubious implication.

J.A. 14. It is likewise "no more than a dubious implication" to conclude that a stay will not prejudice VirtualAgility because VirtualAgility could have filed its response to Salesforce's CBM petition sooner. At that stage, the PTAB had yet to even institute the CBM proceedings, so there was nothing to expedite. Moreover, Salesforce's petition was over 70-pages long and contained a 92-page expert declaration. *See* J.A. 459. VirtualAgility timely responded to the petition.

VirtualAgility invested a significant amount in the development of its patented technology to help it better compete against much larger competitors, but that ability all but disappears when those competitors are using or selling systems

and processes incorporating VirtualAgility's patented technology without permission or obtaining a license.  Extending the amount of time that these larger competitors can use VirtualAgility's patented technology to their benefit and VirtualAgility's detriment further erodes VirtualAgility's ability to compete for customers in its current markets, and to expand into additional markets.

The impact of such erosion extends directly to VirtualAgility's shareholders, many of whom are now in their 70s and 80s.  J.A. 318–19.  Returning value to them has been difficult, and will become increasingly more difficult, for VirtualAgility if it must continue to essentially compete against itself. VirtualAgility and its shareholders have already endured these circumstances since VirtualAgility's inception, due in large part to the amount of time it took for the '413 patent to issue.  Prompt adjudication of VirtualAgility's rights is therefore necessary to help cease the continuing prejudice to VirtualAgility and its shareholders.  This factor strongly weighs in favor of denying a stay.

### 3.    A Stay Carries a Heightened Risk of Evidence Loss

The District Court also did not err when it found that a stay in this case posed a heightened risk of losing evidence, which would unduly prejudice VirtualAgility.  The Defendants do not dispute that the District Court applied the correct law:  "when a case is stayed, witnesses may become unavailable, their memories may fade, and evidence may be lost while the PTO proceedings take

50

place." J.A. 14 (quoting *Ambato Media,* 2012 U.S. Dist. LEXIS 7558, at *5). The Defendants instead quibble with the District Court's findings of fact, namely that Mr. Nelson has historical knowledge about the prosecution of the '413 patent and that his age posts a risk of evidence loss during the stay period. Blue Br. at 28–29. They crassly contend that "thankfully for Mr. Nelson, the record is devoid of evidence that Mr. Nelson, or anyone else of potential relevance is likely to die during any stay pending CBM Review." *Id.* at 29. Like the bulk of their prejudice arguments on appeal, the Defendants failed to raise these arguments before the District Court and therefore waived them on appeal. *Ladd*, 713 F.3d at 655; *see also* J.A. 133–34; J.A. 459–60.

The Defendants' assertions are also wrong. Even under the Defendants' view of the case, Mr. Nelson was a relevant witness—he prosecuted the '413 patent for almost nine of the twelve years it was pending before the PTO. The Defendants also repeatedly pressed for Mr. Nelson's deposition, despite knowing that he was tending to his wife of forty-seven years while she was fighting the final stages of a terminal illness. The Defendants also ignore that advanced age can impact memory and the ability to travel, among other things, increasing the likelihood that a multi-year stay will hamper VirtualAgility's ability to try its case with live testimony.

Moreover, Mr. Nelson was only one "example" of a witness that posed a risk of evidence loss.  J.A. 14.  In addition to Mr. Nelson, the parties pointed to a number of other potentially relevant witnesses of advanced age, none of whom the Defendants challenge in their Opening Brief: Janet Beaven, the widow of the inventor, is also over 70 years old; Tom Roberts of IBM, the Global Client Executive for VirtualAgility's partnership with IBM regarding the global distribution of VirtualAgility's OPS Center and WorkCenter™ software, is over 60 years old; retired U.S. Air Force General Michael Carns—whom the Defendants identified as a relevant witness—is over 70 years old.  J.A. 319.  Given the number of relevant witnesses of advanced age, a lengthy stay will prejudice VirtualAgility.

### E.    A Stay Is Unlikely to Meaningfully Reduce the Burden on the Court and the Parties

For largely the same reasons that a stay is unlikely to simplify this litigation in any meaningful sense, the District Court did not err when it found that a stay was unlikely to substantially lessen the burden on the Court and the parties.  J.A. 15–16.  On appeal, the Defendants recycle their unpersuasive arguments about lost efficiency.  But no one else involved in this lawsuit actually believes that a stay will make this litigation more efficient.  The primary beneficiary of any efficiency from the CBM review—the District Court—was "not convinced that such a result is probable."  J.A. 4.  The Defendants, however, argue that the District Court erred

by giving the burden of litigation factor too little weight by conflating it with the simplification of the issues factor and "ignoring the key legislative history." Blue Br. 37.

The Defendants misrepresent the District Court's decision. The Court separately addressed the burden of litigation factor but noted, under the *Broadcast Innovation* decision that Congress adopted as the basis for § 18(b), that this factor is "not entirely independent" of the simplification of issues factor. J.A. 15. That conclusion naturally flows from the fact that "[i]f granting a stay is unlikely to simplify the issues in the litigation, then it will not likely reduce the overall burden on the court and the parties." J.A. 15.

The District Court then separately addressed the Defendants' generic efficiency arguments, "which substantially overlapp[ed]" with the Defendants' arguments regarding the simplification of the issues. J.A. 15. The Court found that "given the thoroughness of the PTO's prior examination" of the '413 patent, "the single new prior art currently before the PTAB, and the uncertainty of the PTAB's § 101 determination, the Court is not convinced that the CBM review will cancel all or even a substantial number of the asserted claims." *Id.* Similarly, the Court found that "the CBM review will not substantially alleviate the existing demands upon the Court and the parties" with respect to the Oracle Projects and Tecskor product references, "as neither reference is before the PTAB." J.A. 15–

16.  As a result, the Court held that "the burden on this Court and the parties, when measured in context of the overall course of this litigation, will not be substantially lessened by a stay."  *Id.*  The Defendants' recycled generic efficiency arguments do not show any error in this thorough case-specific analysis.

The Court, however, did not end its analysis at that point and ultimately ruled in the Defendants' favor on this factor.  Despite the low likelihood that the stay will save the parties significant expense, the Court ultimately concluded that the burden of litigation factor slightly weighed *in favor of a stay* due to characteristics that are "inherent to all CBM reviews," *i.e.*, their potential to eliminate issues from the district court litigation.  J.A. 16.  Because Section 18(b) endorses a case-by-case analysis, however, the Court rightly held that the "relief from burden inherent to all CBM reviews cannot reasonably serve as the sole basis for tipping the fourth factor in favor of granting a stay."  *Id.*  Otherwise, the statute would provide an automatic stay, contrary to its plain language.  *Compare* AIA § 18(b) (delineating four factors upon which the court should "base[]" its decision), *with* 35 U.S.C. § 315(a)(2) (providing for an "automatic[] stay[]" pending *inter partes* review in certain circumstances).  The District Court thus did not "conflate" the burden of litigation factor with the simplification of the issues factor.

The Court also did not "ignore" the "key" legislative history.  First off, the Defendants have yet to identify *any* ambiguity in Section 18(b) that justifies

relying on the legislative history to mold the statute. Regardless, the Court expressly acknowledged the exact legislative history that the Defendants are relying on. *Compare* J.A. 3–4 (reciting that some courts interpret the burden on the parties factor as "[having] ease[d] the movant's task of demonstrating the need for a stay"), *with* Blue Br. at 36–37 ("Congress included this fourth factor, in part, 'to ease the movant's task of demonstrating the need for a stay.'") (citations omitted). The Court did not ignore anything.

Lastly, the Defendants argue that a stay will reduce the litigation burden on the non-Salesforce Defendants while the "true parties at interest," Salesforce and VirtualAgility, litigate the validity of the '413 patent. Blue Brief at 28. They likewise argue that a stay will reduce the burdens on third parties that have prior art products. The Defendants again did not raise either argument before the District Court, and they therefore waived their right to raise these arguments on appeal. *Ladd*, 713 F.3d at 655; *see also* J.A. 135; J.A. 460.

The Defendants' arguments also fail on the merits. Because of their partnership with Salesforce to deliver customizable software, Defendants such as Dell (which operates a Salesforce Consulting Practice) are not mere "customers" in the traditional sense, but are true interested parties in this case. *See* Order (Docket No. 140), at 4, 2:13-CV-00011-JRG (E.D. Tex. Jan. 31, 2014).

Regarding the alleged burden on third parties, the Defendants are responsible for creating that burden by subpoenaing those parties—nearly three-dozen in total. That self-inflicted burden cannot be the sole basis on which to stay this case. Much of that discovery has also already happened, such that a stay will not reduce those litigation burdens. Many of these third-parties have already produced most of their documents, and the Defendants have already deposed three third-party witnesses.

## F.    Other District Court Decisions Are of Limited Relevance

Section 18(b)(2) authorizes this Court to "ensure consistent application of established precedent," and while "district court decision[s] may inform the issue," they are "not binding precedent," *In re NTP, Inc.*, 654 F.3d 1268, 1276 (Fed. Cir. 2011). The Defendants, however, spend nearly ten pages in their Opening Brief summarizing other district court opinions—none of which has been reviewed by this Court—attempting to show that the decision here is an "outlier" that Congress enacted Section 18(b) to eliminate. Section 18(b), however, does not provide for an automatic stay (or even a presumptive stay), and there are cases in which a stay is not appropriate. This is one of those cases. The fact that a number of other courts have granted motions to stay simply means that, on the facts before each of those courts, a stay was deemed appropriate under the four-factor test.

It also shows that the supposed pro-stay policy embodied in Section 18(b) is actually being carried out. The vast majority of district courts, including courts in the Eastern District of Texas, have granted motions to stay under Section 18(b). *E.g.*, *Landmark Tech., LLC v. iRobot Corp.*, No. 6:13-CV-00411-JDL, Docket No. 47 (E.D. Tex. Jan. 24, 2014); *Blue Calypso, Inc. v. Groupon, Inc.*, No. 6:12-CV-486-MHS (E.D. Tex. Jan. 16, 2014) (granting joint motion to stay after finding that "all four factors favor granting a stay"). The statute, however, recognizes that each litigation and CBM proceeding is different. The Court should not accept the Defendants' invitation to short-circuit the statute simply because other district courts, analyzing different records, have stayed cases. The focus should be on the statutory factors and how they apply to this case.

Indeed, the Defendants' case law survey does not meaningfully compare the facts of this case to those cases in which the district courts have granted stays. Critically, none of the Defendants' cases involves a direct-competitor relationship in which the patentee is significantly smaller than the Defendants and the patent-in-suit covers the patentee's core product. Only two of the sixteen cases in the Defendants' brief—*Progressive Casualty* and *Zillow*—even had evidence that the parties were direct competitors. Both of those cases, however, are distinguishable on their facts.

In *Progressive Casualty*, the patentee (a large insurance company) sued a number of other large insurance companies for infringing patents relating to certain usage-based insurance technologies and online servicing technologies. No. 1:11-CV-00082, 2013 U.S. Dist. LEXIS 54899, at *5 (N.D. Ohio Apr. 17, 2013). Unlike this case, there was no evidence that Progressive would face "outsized consequences" during the stay period, such as loss of market share, erosion of goodwill and potential loss of key witnesses. *See id.* at *21–28; J.A. 14. Correspondingly, there was no evidence that the patents-in-suit covered Progressive's core products. *Progressive Casualty*, 2013 U.S. Dist. LEXIS 54899, at *21–28.

The Court's decision in *Zillow* is likewise inapplicable. Zillow, like Progressive, is a large billion-dollar company, and the patent-in-suit related to only one feature of Zillow's website—the "Zestimate" home valuation service. *Zillow, Inc. v. Trulia, Inc.*, No. C12-1549JLR, 2013 U.S. Dist. LEXIS 144919, at *2 (W.D. Wash. Oct. 4, 2013). Nor was there any evidence of a risk of loss of evidence during the stay period. *See id.* at *20–26. While the Court noted that Zillow had failed to move for a preliminary injunction, *id.* at *21–23, as explained above, requiring a patentee to seek a preliminary injunction to avoid a stay would only increase the cost and expense of the litigation. It would require a mini-trial at the beginning of every case to defeat a stay motion, increasing the burden on the

parties and the Court.  Moreover, it would be difficult to justify when the case is brought in a jurisdiction that promptly disposes of its cases.

Lastly, the Defendants are wrong that a decision affirming the District Court's order will create "difficult precedent" that will discourage the filing of CBM petitions.  Blue Br. at 48–49.  This case presents unique circumstances that will not necessarily be present in other cases—the Defendants are much larger companies that are infringing on the patent that covers VirtualAgility's competing product.  There is also the low potential the CBM proceeding will meaningfully simplify this case and there is a heightened risk of evidence loss due to the age of a number of potential witnesses.  Given the fact-bound nature of the District Court's decision, this case will not serve as a roadblock to staying litigation under Section 18(b).

In short, the Defendants cannot credibly argue that the district courts are not consistently applying established precedent pertaining to a stay under Section 18(b) when, according to the Defendants, a stay has been completely denied in *only 1 out of 16 cases*.  So long as the precedent is consistent, as the Defendants have demonstrated it is, there is no basis for upsetting the District Court's ruling.

## CONCLUSION

The Defendants have failed to show any error in the District Court's stay analysis under § 18(b), let alone an error that warrants reversing the District

Court's decision. For the above reasons, VirtualAgility respectfully requests that the Court affirm the District Court's denial of the Defendants' motion to stay pending the completion of CBM proceedings.

DATED: February 21, 2014          Respectfully submitted,

_____
Christian J. Hurt

**EDWARD CHIN**
TEXAS STATE BAR NO. 50511688
**ANDREW J. WRIGHT**
TEXAS STATE BAR NO. 24063927
**CHRISTIAN HURT**
TEXAS STATE BAR NO. 24059987
**NIX PATTERSON & ROACH, L.L.P.**
5215 N. O'Connor Blvd., Suite 1900
Irving, Texas 75039
972.831.1188 (telephone)
972.444.0716 (facsimile)
edchin@me.com
andrewjwright@me.com
christianhurt@nixlawfirm.com

**DEREK GILLILAND**
TEXAS STATE BAR NO. 24007239
**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, Texas 75638
903.645.7333 (telephone)
903.645.5389 (facsimile)
dgilliland@nixlawfirm.com

**ATTORNEYS FOR PLAINTIFF-APPELLEE VIRTUALAGILITY INC.**

## CERTIFICATE OF SERVICE

On this 21st day of February, 2014, I electronically filed the foregoing

**BRIEF FOR PLAINTIFF-APPELLEE VIRTUALAGILITY INC.** with

the Court using the CM/ECF system.  The following counsel are registered

CM/ECF users and will be served by the appellate CM/ECF system and via

email.

Jose C. Villarreal
Brian D. Range
Joel C. Boehm
Wilson Sonsini Goodrich & Rosati, P.C.
900 S. Capitol of Texas Hwy, Las Cimas IV, 5th Floor
Austin, Texas 78746
(512) 338-5400
(512) 338-5499 (Fax)
Email: jvillarreal@wgsr.com
Email: brange@wgsr.com
Email: jboehm@wgsr.com

Larry K. Shatzer
Wilson Sonsini Goodrich & Rosati, P.C.
1700 K Street, NW, Fifth Floor
Washington, D.C. 20006
(202) 973-8803
(202) 973-8899 (Fax)
Email: lshatzer@wsgr.com

Kevin J. Meek
Baker Botts
98 San Jacinto Blvd
Suite 1500
Austin, Texas 78701-4078
Email: kevin.meek@bakerbotts.com

Darryl J. Adams

Kimberly-Clark Corporation
Baker Botts
98 San Jacinto Blvd
Suite 1500
Austin, Texas 78701-4078
Email: darryl.adams@bakerbotts.com

_____

Christian J. Hurt
*Attorney for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1.        This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 13,864 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.        This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2011 for Mac in Times New Roman 14 point font.

Date: February 21, 2014

_____
Christian J. Hurt
*Attorney for Plaintiff-Appellee*